UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | | |
|---|---|---|
| RONNIE STEVEN CEBALLOS, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 11-21-ART |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION &** |
| UNITED STATES OF AMERICA, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Plaintiff Ronnie Steven Ceballos, formerly an inmate of the U.S. Penitentiary-Big Sandy, filed his complaint in this action under the Federal Tort Claims Act, 28 U.S.C. §§ 2671–80 ("FTCA"). R. 2. Ceballos asserts that federal officials acted with reckless indifference to his safety when they failed to prevent two other inmates from attacking him in 2009. *Id.* The United States filed a motion to dismiss the complaint, asserting that the discretionary function exception bars Ceballos's claims because prisoner safety decisions are based on policy considerations. R. 15. Because Ceballos's claims are barred, the United States' motion is granted.

## BACKGROUND

Ceballos alleges that on December 30, 2008, he submitted an Inmate Request to Staff form (a "copout"), R. 2-3, about a threat of violence. In the copout, Ceballos informed corrections officials that the two inmates residing in the cell next to his were members of a violent prison gang and threatened to kill him while brandishing knives. R. 2 at 2. Ceballos asserts that the staff ignored the information and took no action to protect him.

On January 26, 2009, a member of the same gang murdered another prisoner and corrections officers placed the prison on "lockdown" status. *Id.* Four days later, while the prison was still in lockdown, Ceballos filed another copout indicating that the same two inmates yelled to a fellow gang member that they intended to attack Ceballos as soon as the lockdown was lifted. R. 2-5. Ceballos asserts that the prison staff again took no action to protect him.

The government tells a different story. According to the government, officials never received any copouts from Ceballos. R. 15-1 at 2–3. Rather, Ceballos forged these documents after the attack. *Id.* at 7. Ceballos was "repeatedly caught forging institutional documents for his own advantage," and was also found guilty of other "violations of institutional disciplinary rules involving dishonesty." R. 15-1 at 2; R. 15-3 at 2.

Regardless of whether Ceballos actually filed the copout forms, when the prison was taken off lockdown status on February 2, 2009, the two inmates brutally attacked Ceballos. R. 2 at 2. Ceballos suffered stab wounds, multiple cuts, bruises, fractures to his face, nerve damage to his lower back, and a collapsed lung. R. 2-6. He was treated at a local hospital and returned to the prison three days later. R. 15-1 at 4. As a result of the attack, Ceballos states that he suffers from post-traumatic stress disorder. R. 2 at 2.

In contrast to the allegations in his complaint, Ceballos told a Special Investigative Services ("SIS") officer soon after the assault that the two inmates attacked him because he refused to give them a remote control for a television. *Id.* Other inmates interviewed by SIS corroborated this version of events. R. 15-1 at 4–5. In fact, the SIS report does not indicate that Ceballos ever told the investigating officer of prior threats from the two inmates. R. 15-

2

2 at 9–11.  Upon concluding the investigation, the Bureau of Prisons ("BOP") charged the two inmates with disciplinary infractions for attempted murder, and entered a separation order requiring them to be housed in a separate prison from Ceballos.  *Id.* at 5.

On August 10, 2009, Ceballos filed a grievance with the warden regarding the failure of prison staff to prevent the assault, but he did not receive a response.  R. 2-1 at 2.  On September 28, 2009, Ceballos appealed to the Mid-Atlantic Regional Office.  *Id.* at 3.  The regional office likewise did not respond.  On December 11, 2009, Ceballos appealed to the Central Office.  *Id*. at 4.  The record does not indicate whether he received a response to this final appeal.

On April 12, 2010, Ceballos sought administrative settlement of his claim under the FTCA by filing Standard Form 95, entitled "Claim for Damage, Injury, or Death," with the BOP.  R. 2-1 at 5-6.  On the form, Ceballos detailed the circumstances of the assault and his resulting injuries, as well as his prior efforts to warn prison staff of the threats against him.  *Id*.  Ceballos also demanded $25 million in compensation.  *Id*.  On October 4, 2010, the BOP denied Ceballos's claim, telling him that "nothing in your record at the time of the above incident revealed separation concerns."  R. 2-1 at 9.  Subsequently, Ceballos filed this complaint alleging that BOP officials' failure to protect him despite prior knowledge of threats violated his rights under the Fifth and Eighth Amendments and constituted recklessness and negligence.  R. 2 at 2–3.  The government filed a Rule 12(b)(1) motion to dismiss claiming that the Court lacks subject-matter jurisdiction over Ceballos's claims.

## DISCUSSION

Under Rule 12(b)(1), there are two types of attacks on jurisdiction: facial and factual. *See Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). A facial attack alleges that a complaint insufficiently pleads subject-matter jurisdiction. *Id*. When reviewing a facial attack, a court takes allegations in the complaint as true, just as in a 12(b)(6) motion to dismiss. *Id*. A factual attack, by contrast, disputes facts alleged in a complaint that support subject-matter jurisdiction. *Id*. In that instance, there is no presumptive truthfulness. *Id*. Rather, the Court "must weigh the conflicting evidence to arrive at the factual predicate that subject-matter does or does not exist." *Id*. Here, the government has presented a factual attack because it disputes that Ceballos gave prison officials a copout identifying his attackers.

## I. Discretionary Function Exception

Ceballos brought this case under the FTCA, which provides a limited waiver of sovereign immunity for, among other things, personal injuries caused by government employees in the scope of their employment. 28 U.S.C. § 1346(b)(1). Of course, this is not a blanket rule and exceptions do exist. One such exception is the discretionary function exception. *Sharp ex rel. Estate of Sharp v. United States*, 401 F.3d 440, 443 (6th Cir. 2005). This exception bars suits based on government employees' discretionary actions. 28 U.S.C. § 2680(a); *see Montez ex rel. Estate of Hearlson v. United States*, 359 F.3d 392, 395 (6th Cir. 2004) ("[C]ourts lack subject matter jurisdiction over acts falling within the discretionary function exception.").

But how does a court figure out whether an employee's act was discretionary? Of course, there is a two-part test. First, the Court must consider whether the employee's act or omission violated a mandatory regulation or policy. *Sharp*, 401 F.3d at 443. "If so, the discretionary function exception does not apply." *Id.* (quoting *Rosebush v. United States*, 119 F.3d 438, 441 (6th Cir. 1997)). Here, the plaintiff does not assert that a specific course of action was mandated. Instead, he concedes that the "defendant has met the first prong of the discretionary function test." R. 17 at 5.

Thus, the Court proceeds to step two: was the discretionary function exception designed to shield the action? *See United States v. Gaubert*, 499 U.S. 315, 322 (1991). Here, courts look to Congress's purpose, which was to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984). When established government policy—through statute, regulation, or agency guidelines—allows the agent to exercise discretion, courts presume that the agent's acts are grounded in policy. *Gaubert*, 499 U.S. at 324–25. In this instance, the relevant statutes and federal regulations allow "BOP officials to exercise judgment when making decisions regarding [prisoner] safety." *Montez*, 359 F.3d at 397.

Presumably, this would end the inquiry. It appears that every court to have looked at the discretionary function exception has determined that prisoner safety decisions are grounded in policy and thus not subject to judicial second guessing. As Judge Rogers noted in *Montez*, courts look to the "nature of the decision-making process, not the nature of the

threat" to determine whether the act is grounded in policy. *Id.* at 399 (Rogers, J., concurring).

But the *Montez* majority did not see it that way. The court indicated that the discretionary function exception may not apply when the complaint alleges that BOP officials had knowledge of a sufficiently (A) specific and (B) immediate threat. *See id*. at 398 ("As a general principle, a complaint that alleges the existence of a specific and immediate threat against an inmate is more likely to survive a motion to dismiss than a complaint that either alleges a nonspecific threat or provides only conclusory statements regarding the existence of a threat.").

## A. Examples of "Specific and Immediate" Threats

So how does a court determine when a threat is specific and immediate? The Sixth Circuit illustrated the specific and immediate threat test in *Montez* with three case examples: a yes, a no, and a "close call."

*Yes:* When a prison guard stands by idly while a number of inmates chase and severely beat another inmate, a specific and immediate threat exists. *Montez*, 359 F.3d at 398 (citing *United States v. Muniz*, 374 U.S. 150, 152 (1963)). "A guard's conscious decision not to protect an inmate from a specific and immediate attack cannot 'be said to be grounded'" in policy. *Id*. (quoting *Gaubert*, 499 U.S. at 325).

*No:* The facts of *Montez* itself provide a "no" example. There the plaintiff alleged that prison officials should have known he was in imminent danger of attack because he was in protective lock-up prior to the attack. *Id*. He also alleged that prison officials should have known that they placed him in a facility that was inadequate to protect him from assaults by

fellow prisoners. *Id*. Neither of these allegations demonstrated a specific or immediate threat. *Id*. at 398-99.

 *Close call:* A closer case exists when a plaintiff alleges that prison officials were negligent by not informing him that his youthful appearance placed him at a higher risk of sexual assault. *Id*. at 397-98 (citing *Dykstra v. United States Bureau of Prisons*, 140 F.3d 791, 795-96 (8th Cir. 1998)). After the plaintiff informed guards that another inmate had been staring at him, he claims the guards were again negligent in not acting. *Id*. at 397–98 (citing *Dykstra*, 140 F.3d at 795). While the Sixth Circuit recognized this was a "close case," it did not criticize the Eighth Circuit's ultimate decision to dismiss the case under the discretionary function exception. *Id*. at 398 (citing *Dykstra*, 140 F.3d at 795).

**B. Why the Exception to the Exception?**

 Judge Rogers noted in his concurring opinion that the specific and immediate test is a break from how courts normally think of applying the discretionary function exception. But if courts extend the protections of the discretionary function exception to non-policy positions—like prison guards—perhaps the "specific and immediate" test makes some sense. Indeed, in *Gaubert*, Justice Scalia cautioned against applying the discretionary function exception to employees "working at the operational level" who are "not responsible for policy decisions, even though policy considerations may be highly relevant to [their] actions." 499 U.S. at 335 (Scalia, J., concurring). Justice Scalia's view did not win the day and the discretionary function exception now has broad application, including protection for low-level government employees not vested with making policy decisions. But it cannot be that all operational decisions are based in policy.

7

Perhaps the best way to think about the Sixth Circuit's exception to the discretionary function is that it allows courts to consider situations where there is a high likelihood that actions are not based in policy. Inaction in the face of a specific and immediate threat presents just this kind of situation. As discussed in *Montez,* when an employee does nothing in response to a specific and immediate threat, it is less likely the decision was "grounded" in policy. *See Montez*, 359 F.3d at 398 (reasoning that inaction by BOP officials in response to specific and immediate threats is less likely to be grounded in a specific policy). But even inaction is not always clear. For example, a prison guard may wait to intervene in an altercation between inmates until he feels it is safe to do so, in accordance with BOP occupational safety policies. U.S. Dep't of Justice, Federal Bureau of Prisons Program Statement 1600.09, ch. 1 (October 31, 2007) (directing employees to "[p]erform their duties in the safest possible manner"). Depending on the facts of the case, this may be sufficient for the discretionary function exception.

This shows that the exception to the exception must be a two-way street. That is, the Sixth Circuit's exception to the discretionary function must involve burden shifting between the plaintiff and defendant. The initial presumption is that actions by BOP officials regarding prisoner safety are grounded in policy. The plaintiff can rebut this presumption with allegations of a specific and immediate threat because there is a higher likelihood that actions are not grounded in public policy in these situations. But if so, the government must still be given the opportunity to explain how its action or inaction was "grounded" in some kind of policy. Fortunately, the Court does not have to delve into burden shifting for this case because Ceballos did not allege an immediate threat.

## II. Ceballos Alleged a Specific Threat

The threat to Ceballos was specific because he identified the two assailants that eventually attacked him. The government asserts that Ceballos never notified prison officials of the threat, but even if this were true, the Court could not rely on this ground to grant the government's Rule 12(b)(1) motion to dismiss. When a factual attack on subject-matter jurisdiction also implicates the merits of the plaintiff's claim, the Sixth Circuit requires a district court to hold that jurisdiction exists and address the objection as an attack on the merits of the plaintiff's claim. *See Gentek Bldg. Prods.*, 491 F.3d at 330 ("If, on the other hand, an attack on subject-matter jurisdiction also implicates an element of the cause of action, then the district court should 'find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's claim.'" (quoting *Garcia v. Copenhaver, Bell & Assoc.*, 104 F.3d 1256, 1261 (11th Cir. 1997)).[1] Here, whether officials received Ceballos's copout is not only a question about the applicability of the discretionary function exception, but also it is relevant as to whether the officials were negligent at all. Thus, the factual attack presented by the government is "intertwined with the merits" of Ceballos's

---

[1] Although there is some logic to this point, it seems odd that a court would ever assume jurisdiction in order to "skip ahead" and resolve the merits of a claim. Without jurisdiction, a court is without authority. *May v. Wal-Mart Stores, Inc.*, 751 F. Supp. 2d 946, 949 (E.D. Ky 2010). Thus, irrespective of whether a jurisdictional decision affects the ultimate outcome, a court's jurisdiction should always be determined at the outset. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 101 (1998) (plurality opinion) (rejecting a doctrine of "'hypothetical jurisdiction' that enables a court to resolve contested questions of law when its jurisdiction is in doubt"); *see id.* ("Hypothetical jurisdiction produces nothing more than a hypothetical judgment—which comes to the same thing as an advisory opinion, disapproved by [the Supreme Court] from the beginning.") (citing *Muskrat v. United States*, 219 U.S. 346, 362 (1911) and *Hayburn's Case*, 2 Dall. 409 (1792)). This is especially true with respect to sovereign immunity, which protects, among other things, the coffers of the government. *See Turner v. Astrue*, 790 F. Supp. 2d 584, 585-86 (E.D. Ky. 2011). If courts say, "We will not determine whether the government's immunity exists until we make a merits-based decision," then the purpose—in part—is lost as scarce government resources are expended. Furthermore, when courts act without jurisdiction, we are truly usurping powers we simply do not have. *See Stump v. Sparkman*, 435 U.S. 349, 356 n.6 (1978) ("Where there is clearly no jurisdiction over the subject-matter any authority exercised is a usurped authority, and for the exercise of such authority, when the want of jurisdiction is known to the judge, no excuse is permissible." (quoting *Bradley v. Fisher*, 80 U.S. 335, 351–52 (1871)).

claim. *Id*. at 331. Therefore, under current Sixth Circuit law, it cannot be a basis for a 12(b)(1) dismissal. *Id*.

### III. Ceballos Did Not Allege a Sufficiently Immediate Threat

If specificity were the only issue, the Court would have to find that the discretionary function exception does not apply. But Ceballos must also allege a sufficiently immediate threat, which he did not.[2] Ceballos warned BOP officials of the two specific inmates that would attack him, but at best Ceballos alleged a threat at "some point" in the future, not an imminent threat. Even Ceballos concedes that the same inmates had threatened him more than a month prior to the lockdown and had done nothing up to that point to follow through on the threat. R. 2 at 2. This lacks the same degree of immediacy seen in *Muniz*, where harm to the inmate was virtually assured unless BOP officials intervened. Additionally, applying a strict immediacy rule makes sense for at least two reasons. First, it provides a way to filter out decisions that are not grounded in policy and therefore not entitled to substantial deference. Second, it is in line with other courts that have agreed that deference to prison safety decisions is important and should only be second-guessed in the rarest of circumstances. *See Dykstra*, 140 F.3d at 796 ("Prison officials supervise inmates based upon security levels, available resources, classification of inmates, and other factors. These factors upon which prison officials base such decisions are inherently grounded in social, political, and economic policy. We have no difficulty in concluding that the discretionary function

---

[2] There is some debate as to who bears the burden of proof on this point. *See Sharp*, 401 F.3d at 443 n.1. Because the plaintiff bears the burden of rebutting the presumption that safety decisions by prison officials are not the kind the discretionary function exception was designed to protect, *Montez*, 359 F.3d at 397, it would seem the ultimate burden is on Ceballos to demonstrate that the exception to the exception applies. But that debate need not be decided here. No matter who bears the burden, the immediacy element is simply not met. There is no evidence in the record demonstrating that the threat was going to be acted on immediately. And, if the burden is on the government, they have submitted evidence that the attack was not imminent when it was allegedly reported.

exception applies to the correctional officer's decision not to place Dykstra in protective custody or to take other protective action."); *Cohen v. United States*, 151 F.3d 1338, 1344 (11th Cir. 1998) ("Deciding how to classify prisoners and choosing the institution in which to place them are part and parcel of the inherently policy-laden endeavor of maintaining order and preserving security within our nation's prisons."); *Donaldson v. United States*, 281 F. App'x 75, 77 (3d Cir. 2008) ("[T]he judgment involved in this case—*i.e.*, how best to protect one inmate from the threat of attack by another—'is of the kind that the discretionary function exception was designed to shield.'"); *Alfrey v. United States*, 276 F.3d 557, 565 (9th Cir. 2002) ("[T]o decide what steps to take in response to a reported threat, an officer must set priorities among all extant risks: the risk presented by the reported threat, along with the other risks that inevitably arise in a prison. Those types of decisions implicate social and public-policy considerations.").

Even accepting all of his allegations as true, Ceballos has simply not alleged facts showing that BOP officials were aware of an *immediate* threat that would allow this Court to conclude that their decisions were not grounded in public policy. Indeed, according to his allegations alone, he provided this information during the lockdown. Obviously, during a lockdown, guards and prison officials have many pressing considerations and priorities. If courts were to second-guess these decisions, effective prison administration would be a thing of the past. Ceballos has simply failed to demonstrate that they should have acted quicker on his alleged copouts or that the threat to him was "immediate."

## CONCLUSION

Accordingly, it is **ORDERED** that the United States' motion to dismiss, R. 15, is **GRANTED**. The Court will issue a separate judgment.

This the 22nd day of November, 2011.

Signed By:
*Amul R. Thapar*  AT
United States District Judge